AO 108 (Rev. 01/09) Application for a Warrant to Seize Personal Property Subject to Civil Forfeiture

# UNITED STATES DISTRICT COURT
for the
Southern District of Ohio

| | |
|---|---|
| In the Matter of the Seizure of<br>*(Briefly describe the property to be seized)*<br>$310,000.00 transferred to Security Benefit Life<br>Insurance via check #4618 from Acct #6919 at PNC<br>Bank in the name of Greg and Linda Oldiges | )<br>)<br>)<br>)<br>)<br>)    Case No.   3:13 mj 31    MICHAEL R. MERZ |

## APPLICATION FOR A WARRANT
## TO SEIZE PERSONAL PROPERTY SUBJECT TO CIVIL FORFEITURE

I, a federal law enforcement officer or attorney for the government, request a seizure warrant and state under penalty of perjury that I have reason to believe that the following property in the _____Southern_____ District of _____Ohio_____ is subject to forfeiture to the United States of America under _____ U.S.C. § _____ *(describe the property)*:

Civil and Criminal Forfeiture Statutes: 18 USC 981(a)(1)(C) and 28 USC 2461(c); and 18 USC 981(a)(1)(A) and 18 USC 982(A)(1).

$310,000.00 transferred to Security Benefit Life Insurance via check #4618 from Acct #6919 at PNC Bank in the name of Greg and Linda Oldiges.

The application is based on these facts:
See Attached Affidavit.

❏ Continued on the attached sheet.

_____
*Applicant's signature*

David Gibson, Special Agent, HSI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: ___01/31/2013___

_____
*Judge's signature*

City and state: ___Dayton, Ohio___

Michael R. Merz, United States Magistrate Judge
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF SEIZURE WARRANT

I, David J. Gibson (your Affiant), a Special Agent with Immigration and Customs Enforcement (ICE) Homeland Security Investigations ("HSI"), being duly sworn, depose and state as follows:

### Introduction and Agent Background

1. I am currently a Special Agent with the Immigration and Customs Enforcement (ICE), Homeland Security Investigations (HSI), Office of the Resident Agent in Charge (RAC), Cleveland, Ohio. I have been employed as a Special Agent since April, 2009. During the course of my career, I have received training in financial investigations, fraud, money laundering and the tactics of money laundering organizations. I am a graduate of the Federal Law Enforcement Training Center's Criminal Investigator Training Program, the ICE Special Agent Training Program, and the ICE Asset Forfeiture and Financial Investigations School. I possess a bachelor's degree in business with a major in finance, and I have held professional designations as a Certified Fraud Examiner and a Certified Anti-Money Laundering Specialist. Prior to my career in law enforcement, I served for three years as an investigator in the financial services industry.

2. I have personally participated in the investigation set forth below. I am familiar with the facts and circumstances of the investigation through my personal participation; from other law enforcement agencies; from my discussions with individuals involved in the investigation; and from my review of records and reports relating to the investigation. Unless otherwise noted, wherever in this affidavit I assert that a statement was made, the information was provided by a source of information (SOI), law enforcement officer or witness who may have had either direct or hearsay knowledge of that statement and to whom I or others have spoken or whose reports I have read and reviewed. Such statements are among many statements made by others and are stated in substance and in part unless otherwise indicated. Because this affidavit is being submitted for the limited purpose of securing a seizure warrant, I have not included each and every fact known to me concerning this investigation. I have set forth only those facts that I believe are necessary to establish probable cause to believe that the following assets are subject to seizure and forfeiture. Based on my training and experience, I know that brokerage companies offer a portfolio of investment-grade, security, and interest-bearing products that carry cash and marketable values. I further know that financial institutions employ the use of computer systems and software packages that allow for the reverse tracing of payments received and corresponding purchase of financial products.

3. I submitted an Affidavit on January 29, 2013 in support of the seizure of the following assets:

   a. Acct #9661 at JP Morgan Chase Bank in the name of Williams Brothers, Inc.,
      All contents except $100,000.00;
   b. Acct #8949 at JP Morgan Chase Bank in the name of Williams Brothers, Inc.;
      All contents;

    c. Acct #6919 at PNC Bank in the name of Greg and Linda Oldiges; All contents except $10,000.00;

    d. Acct #9549 at PNC Bank in the name of Greg and Linda Oldiges; All contents;

    e. Acct #9672 at Huntington Bank in the name of Hard Rock Partners 2012-A LP, All contents up to $100,000.00[1]; and

    f. 2012 GMC PICKUP VIN #3GTP2WE77CG141102.

4. This Affidavit is submitted in support of the seizure of the following assets:

    **a. $290,000.00 transferred to Fidelity Investments/NFS via check #4616 from Acct #6919 at PNC Bank in the name of Greg and Linda Oldiges;**

    **b. $300,000.00 transferred to Security Benefit Life Insurance by Greg Oldiges via Check #4617 drawn from PNC Bank Acct #6919, in the name of Greg and Linda Oldiges; and**

    **c. $310,000.00 transferred to Security Benefit Life Insurance by Greg Oldiges via Check ##4618[2] drawn from PNC Bank Acct #6919, in the name of Greg and Linda Oldiges.**

## Probable Cause

5. I am investigating allegations involving the hiring, encouraging and inducing, and concealing and harboring of, contracting with, and other remuneration and benefits provided to illegal aliens, along with activity associated therewith including, but not limited to, identity theft, money laundering, false statements and documents, and conspiracy. My investigation entails seeking to determine whether this activity, in fact, occurred, and if so, whether it violated 8 U.S.C § 1324 (Bringing in and harboring certain aliens), 8 U.S.C. § 1324a (Unlawful employment of aliens), 18 USC § 1028 (Fraud and related activity in connection with identification documents, authentication features, and information), 18 U.S.C. § 1028A (Aggravated identity theft), 18 U.S.C. §1029(Fraud in connection with access devices), 18 U.S.C. § 1956 (Laundering of monetary instruments), 18 U.S.C. § 1957 (Engaging in monetary transactions in property derived from specified unlawful activity), 18 U.S.C. § 1001 (Statements or entries generally), 18 U.S.C. § 371 (Conspiracy), or other provisions. The focus of my investigation pertains to actions taken by officers, employees, and other individuals associated with William Brothers Roofing and Siding, Co., Inc. ("WILLIAMS BROS"), a construction and repair business.

6. Based on the information learned during the course of my investigation, as discussed below:

a.     There is probable cause to believe that the 2012 GMC Pickup truck, VIN:3GTP2WE77CG141102, is subject to forfeiture pursuant to:

---

[1] The bank accounts described in paragraph 3 a-e are collectively described as the "BANK ACCOUNTS".
[2] The assets described in paragraph 4 a-c are collectively described as the "SECURITIES".

i. 18 U.S.C. § 981(a)(1)(C)(civil) and 28 U.S.C. § 2461(c)(criminal) as it represents the proceeds of violations of 8 U.S.C § 1324 (Bringing in and harboring certain aliens), 18 USC § 1028 (Fraud and related activity in connection with identification documents, authentication features, and information), 18 U.S.C. § 1028A (Aggravated identity theft), 18 U.S.C. §1029(Fraud in connection with access devices), 18 U.S.C. § 1956 (Laundering of monetary instruments), 18 U.S.C. § 1957 (Engaging in monetary transactions in property derived from specified unlawful activity), 18 U.S.C. § 1001 (Statements or entries generally), and/or 18 U.S.C. § 371 (Conspiracy);

ii. 18 U.S.C. § 981(a)(1)(A)(civil) and 18 U.S.C. § 982(A)(1)(criminal) as it is involved in a violation of 18 U.S.C. § 1956 (Laundering of monetary instruments), 18 U.S.C. § 1957 (Engaging in monetary transactions in property derived from specified unlawful activity);

iii. 8 U.S.C. § 1324(b)(civil) and 28 U.S.C. § 2461(c)(criminal) as it represents a vehicle that has been or is being used in the commission of a violation of 8 U.S.C. § 1324(a), or it represents the gross proceeds of such violation or is property traceable to such proceeds; and/or

iv. 18 U.S.C.§ 1029(c)(1)(c)(criminal) as it represents property used or intended to be used to commit a violation of 18 U.S.C. §1029(Fraud in connection with access devices).

b.      There is probable cause to believe that the contents of the BANK ACCOUNTS are subject to forfeiture pursuant to:

i. 18 U.S.C. § 981(a)(1)(C)(civil) and 28 U.S.C. § 2461(c)(criminal) as it represents the proceeds of violations of 8 U.S.C § 1324 (Bringing in and harboring certain aliens), 18 USC § 1028 (Fraud and related activity in connection with identification documents, authentication features, and information), 18 U.S.C. § 1028A (Aggravated identity theft), 18 U.S.C. §1029(Fraud in connection with access devices), 18 U.S.C. § 1956 (Laundering of monetary instruments), 18 U.S.C. § 1957 (Engaging in monetary transactions in property derived from specified unlawful activity), 18 U.S.C. § 1001 (Statements or entries generally), and/or 18 U.S.C. § 371 (Conspiracy);

ii. 18 U.S.C. § 981(a)(1)(A)(civil) and 18 U.S.C. § 982(A)(1)(criminal) as it is involved in a violation of 18 U.S.C. § 1956 (Laundering of monetary instruments), 18 U.S.C. § 1957 (Engaging in monetary transactions in property derived from specified unlawful activity);

iii. 8 U.S.C. § 1324(b)(civil) and 28 U.S.C. § 2461(c)(criminal) as it represents the gross proceeds of a violation of 8 U.S.C. § 1324(a), or is property traceable to such proceeds; and/or

iv. 18 U.S.C.§ 1029(c)(1)(c)(criminal) as it represents property used or intended to be used to commit a violation of 18 U.S.C. §1029(Fraud in connection with access devices).

c.      There is probable cause to believe that the SECURITIES are subject to forfeiture pursuant to:

i. 18 U.S.C. § 981(a)(1)(C)(civil) and 28 U.S.C. § 2461(c)(criminal) as they represent the proceeds of violations of 8 U.S.C § 1324 (Bringing in and harboring certain aliens), 18 USC § 1028 (Fraud and related activity in connection with identification documents, authentication features, and information), 18 U.S.C. § 1028A (Aggravated identity theft), 18 U.S.C. §1029(Fraud in connection with access devices), 18 U.S.C. § 1956 (Laundering of monetary instruments), 18 U.S.C. § 1957 (Engaging in monetary transactions in property derived from specified unlawful activity), 18 U.S.C. § 1001 (Statements or entries generally), and/or 18 U.S.C. § 371 (Conspiracy); and/or

ii. 18 U.S.C. § 981(a)(1)(A)(civil) and 18 U.S.C. § 982(A)(1)(criminal) as they are involved in a violation of 18 U.S.C. § 1956 (Laundering of monetary instruments), 18 U.S.C. § 1957 (Engaging in monetary transactions in property derived from specified unlawful activity).

7.    Greg OLDIGES has been working at WILLIAMS BROS since 1984.  OLDIGES and Martin WILLIAMS had been partial owners of WILLIAMS BROS for some period.  But, in 2006, OLDIGES bought the company from WILLIAMS.

8.    WILLIAMS BROS, with the knowledge and at the direction of OLDIGES, used illegal aliens as workers for its roofing and siding projects.  WILLIAMS BROS has been using illegal alien workers for at least ten years.  WILLIAMS BROS pays the illegal aliens approximately half as much as the legal workers.

9.    A former WILLIAMS BROS employee, Steven HISLE, was employed as the superintendent of WILLIAMS BROS from 2000 until 2009.  HISLE'S responsibilities included managing employees, setting up roofing and siding jobs, and driving to various job sites to inspect the work performed by WILLIAMS BROS' illegal alien workers.

10.    WILLIAMS BROS has workers designated as employees and others designated as subcontractors.  Some workers are U.S. citizens; but the majority of the people doing the roofing work are illegal aliens.  During a busy roofing season, WILLIAMS BROS employs about 20 persons it designates as employees and 8 persons designated as subcontractors- 4 of whom are illegal aliens.  From 2007 through 2012, the illegal subcontractors have changed.  None of the persons WILLIAMS BROS designates as employees are illegal aliens.  WILLIAMS BROS' roofing season lasts from March or April through September.

11.    The illegal aliens designated as subcontractors are used by WILLIAMS BROS as supervisors for teams of 8-10 illegal aliens per supervisor.  The supervisors include:

## Sergio RODRIGUEZ-Vilches ("RODRIGUEZ")

12.    RODRIGUEZ is an illegal alien who has worked for WILLIAMS BROS as a purported subcontractor since 2000.  RODRIGUEZ's duties included being a foreman and supervising other illegal aliens.  RODRIGUEZ travels back and forth from the United States and Mexico illegally after each roofing season.  RODRIGUEZ accompanies the illegal aliens as they cross the U.S.-Mexican border.

13.    RODRIGUEZ has been caught at least five times by the USBP while attempting to enter the U.S. illegally with a group of illegal aliens.  Queries were conducted in ENFORCE for information regarding RODRIGUEZ'S immigration history.  Query results revealed that he had been apprehended by USBP on five occasions for illegally entering the U.S., specifically, in May 1998, May 2005, March 2009, April 2009, and April 2012.

## Rogelio AMARO-Balbuena ("AMARO")

14.    AMARO is an illegal alien who has worked with WILLIAMS BROS as a purported subcontractor since 2000.  AMARO supervised a group of eight to ten illegal aliens who worked on roofing projects for WILLIAMS BROS.

## Fabian PEREZ-Angel ("PEREZ")

15.    PEREZ is an illegal alien who has worked for WILLIAMS BROS as a purported subcontractor since 2000.  PEREZ supervised a group of eight to ten illegal aliens who worked on roofing projects for WILLIAMS BROS.

## Oscar VALENCIA-Mungia ("VALENCIA")

16.    VALENCIA is an illegal alien who has worked for WILLIAMS BROS for several years.  VALENCIA supervised a group of approximately 8-10 illegal aliens who worked on roofing projects for WILLIAMS BROS.  VALENCIA was apprehended by U.S. Immigration and Customs Enforcement personnel in June, 2011, for illegally entering the U.S. and ordered to voluntarily return to Mexico.

## THE VIOLATIONS

17.    In April 2007 and again in May 2008, OLDIGES instructed one of his superintendents, HISLE, to travel to Texas for the purpose of picking up a group of illegal aliens in person and transporting them back to Dayton, OH, in order to work for OLDIGES at WILLIAMS BROS. on roofing and other construction-related projects. On both occasions, approximately $10,000 dollars in cash was withdrawn by the bookkeeper Steve KRAMARCZYK ("KRAMERCZYK") at the direction of OLDIGES from a WILLIAMS BROS' Account at J.P. Morgan Chase ("JPMC"). OLDIGES gave the cash to HISLE and directed him to give the money to RODRIGUEZ once HISLE arrived in Texas. OLDIGES told HISLE that the $10,000 was to be paid to the illegal alien smugglers once they reached Houston, Texas, and the illegal aliens were safely in HISLE's custody.

18.    A secretary at WILLIAMS BROS, Jennifer KNAPP, made the travel arrangements for HISLE in 2007 and 2008, via Travelocity. KNAPP booked HISLE'S airfare, hotel and a rental car. HISLE flew to Houston, Texas, on both occasions, met with RODRIGUEZ, gave RODRIGUEZ approximately $8000-$10,000 in cash, picked up the group of illegal aliens, and transported them back to Dayton, OH.

19.    In 2007 and 2008, smuggling fees of $1000 per illegal alien were paid up front. Once the illegal aliens began to work for OLDIGES, money was deducted from their weekly checks as repayment for the smuggling fees prepaid by OLDIGES.

20.    During the May 2008 trip to Texas, HISLE met with RODRIGUEZ at a motel where smugglers were waiting with the group of illegal aliens. Once the smugglers were paid, the group of illegal aliens were loaded into the superintendent's rental van and transported back to Dayton, OH.

21.    OLDIGES contacted HISLE several times throughout the trip for updates on their progress. These calls were made on the work cell phones provided by WILLIAMS BROS to OLDIGES and the superintendent. Cell phone records confirm calls between OLDIGES work cell phone and HISLE'S work cell phone in April 2007 and May 2008 and indicate northbound travel to Ohio from Texas during these dates.

22.    RODRIGUEZ received a weekly check from OLDIGES ranging from $8,000 - $10,000, which RODRIGUEZ distributed among his illegal alien work crew at his discretion in the form of cash payments. The illegal aliens lived with RODRIGUEZ for the duration of the roofing season while they worked for WILLIAMS BROS.

23.    In 2009, OLDIGES sought to obtain illegal aliens in the same manner as he did in 2007 and 2008, but RODRIGUEZ and the illegal aliens were apprehended by the U.S. Border Patrol (USBP). OLDIGES used other illegal alien workers that year.

24.     HISLE had a falling out with OLDIGES and quit his employment with WILLIAMS BROS in 2009.  After HISLE's departure, OLDIGES took over the managerial duties as they pertained to supervising the illegal alien works until OLDIGES hired Dennis CORNISH in May 2011.

25.     Dennis CORNISH became the superintendent for WILLIAMS BROS.  CORNISH took over the direct interaction with the illegal alien workforce.

26.     In May 2011, OLDIGES sought to obtain an illegal alien workforce once again, this time for the 2011 roofing season.  However, he was unable to utilize RODRIGUEZ for this purpose.  So instead, illegal aliens from the local area were used.  OLDIGES directed KRAMERCZYK to transfer $8000 to Adrian Cacacco.  KRAMERCZYK set up an ACH transfer in the amount of $8000 on or about May 10, 2011, from WILLIAMS BROS' Account #9661 at JPMC.

27.     SA Brian Turk obtained and reviewed account statements and a signature card for Account #0614 at Bank of America in the name of Adrian PICAZO-Garcia.  The documents reveal a May 11, 2011 deposit into the account in the amount of $8000 from WILLIAMS BROS with the note of "Adrian Cacacco."  WILLIAMS BROS Account #9661 Records reveal a $8000 ACH debit on May 11, 2011.

28.     SA Brian Turk conducted an Immigration and Customs Enforcement Intelligence Fusion System query for any information regarding PICAZO.  Query results revealed seven immigration incidents relating to the address of 2500 W. Mount Houston Rd, Houston, Texas.  Several of these incidents related to the arrest of illegal aliens from Mexico who provided their address as 2500 W. Mount Houston Rd., Houston, TX.  One incident occurred on September 24, 2012, which involved the arrest of a subject who was harboring thirteen illegal aliens from Mexico at 2500 W. Mount Houston Rd, Trailer 109, Houston, Texas. HSI Agents responded and detained and administratively arrested approximately 13 illegal aliens.

29.     RODRIGUEZ attempted to illegally cross the U.S. border from Mexico in 2012.  RODRIGUEZ was caught and arrested by the USBP soon after he crossed the border with a group of illegal alien workers intended to be used at WILLIAMS BROS.

30.     A U.S. Citizenship and Immigration Services ("USCIS") database query revealed that RODRIGUEZ was one of eighteen illegal aliens apprehended by the U.S. Border Patrol on March 17, 2012, and removed to Mexico on April 22, 2012.  RODRIGUEZ was apprehended by Border Patrol Agents ("BPA") from the Zapata Station in Zapata County, Texas.

31.     CORNISH had plans to meet RODRIGUEZ in Texas in the spring of 2012 to transport a group of illegal aliens back to Dayton, OH.  But CORNISH never did since the group was apprehended after crossing the U.S. border.

32.     AMARO received eleven checks from WILLIAMS BROS from 04/27/12 – 06/15/12 for work that he completed on nineteen buildings on Peachwood Dr., Dayton, OH  45458.  The elelven checks totaled in excess of $70,000, and the project earned WILLIAMS BROS

approximately $568,000.  AMARO is usually only given roofing projects which earn WILLIAMS BROS more than $10,000 to keep the profit margin as high as possible.

33.    During 2012, WILLIAMS BROS' customer Green Velvet SOD Farms, on Snider Rd. in Dayton, OH, contacted WILLIAMS BROS in relation to a roofing project and informed OLDIGES that it (Green Velveet SOD Farms) did not want illegal aliens working on the project. OLDIGES subsequently replaced AMARO and his crew with a "legal crew."

34.    A different customer, located on Walnut Grove Dr., in Centerville, OH, similarly informed OLDIGES that illegal aliens would not be permitted to work on the roof.  OLDIGES likewise replaced AMARO and his crew with a "legal crew."

35.    In or about July 2012, in the Greene County Common Pleas Court, WILLIAMS BROS sued two customers, seeking $17,457.35 in damages.  The customers paid a portion for the project at issue but did not wish to pay the full amount due because of the alleged use of illegal aliens on the project, which was located at 570 Carpenter Rd., Bellbrook, OH  45305. OLDIGES used RODRIGUEZ as a foreman at this project, and RODRIGUEZ had approximately ten illegal alien workers assisting him.  WILLIAMS BROS charged the customers approximately $23,000 for the roofing job.  RODRIGUEZ was paid approximately $3,500 to complete the job via a WILLIAMS BROS check drawn from WILLIAMS BROS' primary business checking account with JPMorgan Chase ("JPMC"), account XXXXXX9661, dated 10/10/11, made payable to the name of "Selestino Loya-Valdovinos," a name used by RODRIGUEZ.  The aforementioned check amount was $8,055.00, because it was for payment of roofing jobs in addition to the one at issue in the lawsuit.

36.    On or about November 30, 2012, SA Brian, SA Jason Greer, and Dayton Police Task Force Officer (TFO) Sean Copley conducted surveillance at a residence located on Meadowlands Dr., in Fairborn, OH.  Your affiant observed approximately 8 unidentified Hispanic males working on the roof of the aforementioned residence.  Your affiant and TFO Copley observed the following vehicles/trailer at the residence: OH Registration:  PHJ9090, Year: 2003, Trim: 2500 Maxi, 2500, Vehicle Make:  Dodge, Vehicle Model: Ram Cargo; OH Registration:  TPZ1586, Year: 2006, Vehicle Make: LOAD, Vehicle Model: Black Trailer; OH Registration:  PHM4511, Year: 2000, Trim: XL, XLT, XLT, Lariat, Lariat, XL, Vehicle Make: Ford Vehicle, Model: F-350 Super Duty.  Subsequent investigation revealed that the aforementioned vehicles/trailer were registered to Joann Amaro, the wife of AMARO.

37.    On or about December 06, 2012, HSI SA Bradley Scott conducted surveillance at a residence on Windbluff Point, Dayton, OH.  SA Scott observed a WILLIAMS BROS advertisement sign near the aforementioned address.  Continuing on or about December 6, 2012, SA Brian Turk and other agents conducted surveillance at the residence and observed AMARO and his crew working on a roof.

38.    On or about December 18, 2012, SA Brian Turk conducted surveillance of AMARO at a residence on Hodapp Ave., Dayton, OH.  Your affiant observed AMARO and three other Hispanic males working on the roof of the aforementioned address.

39.    On or about January 03, 2013, HSI Special Agents conducted a consensual recorded conversation between a SOI and OLDIGES regarding WILLIAMS BROS during which the amount to be reported to the IRS in AMARO's 1099 form was discussed.

## HIDING THE USE OF ILLEGALS

40.    In what appears to be an effort to hide WILLIAM BROS' use of illegal aliens, OLDIGES obtains or directs others to obtain fictitious photo identifications, false names, and fictitious or fraudulently obtained social security numbers.  WILLIAMS BROS provided the IRS 1099 Forms for payments WILLIAMS BROS made to the illegal alien supervisors.  The 1099 Forms required that an identification number of the payee be included.  OLDIGES obtained or directed others to obtain fictitious photo identifications with corresponding fictitious or false social security numbers, which in turn were used in the IRS Forms and related information and paperwork provided to the IRS.  This fictitious Personal Identifiable Information ("PII") was also included on W-9 Forms, Request for Taxpayer Identification Number and Certification, and kept for internal company records.  At the end of a roofing season, OLDIGES directed KRAMERCZYK to submit the false PII to the IRS on a 1099 Form, Miscellaneous Income form.

41.    Typically a year or two after submitting the 1099 forms, OLDIGES would receive correspondence from the IRS stating that the names and social security numbers provided to the IRS did not match or were otherwise invalid.  OLDIGES would tell KRAMERCZYK that the names of the supervisors and their information needed to be changed.  OLDIGES would instruct Dennis CORNISH to obtain new names, identification and social security numbers for the supervisors so that OLDIGES could provide a new set of personal identifiers to the IRS.  At the end of the year, the new fictitious PII was provided to the IRS on the 1099 Forms.

42.    This cycle of obtaining false documentation and submitting it to the IRS has been taking place for several years.  Several of the supervisors who have been receiving checks from WILIAMS BROS over the last several years are on their third or fourth name change.

## FALSE PII FOR RODRIGUEZ

43.    OLDIGES and WILLIAMS BROS used the following PII when paying RODRIGUEZ and when reporting the payments to RODRIGUEZ to the IRS, though sometimes the payments were not reported to the IRS at all:

DATE:  06/13/2002 - 07/16/2003
NAME USED:  Sergio RODRIGUEZ
SSN:  xxx-xx-4821[3]
PAID: $203,693

DATE:  06/13/2005 – 05/15/2006
NAME USED:  Cristobal RODRIGUEZ
SSN: 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
PAID: $110,760

DATE: 05/19/2006 – 10/23/2007
NAME USED: Rafael Ruiz-Corona
SSN: N/A
PAID: $227,416 (Not reported to the IRS)

DATE: 05/27/2011 – 11/18/2011
NAME USED: Selestino Loya-Valdovinof
SSN: N/A
PAID: $130,122 (Not reported to the IRS)

**FALSE PII FOR PEREZ**

44.    OLDIGES and WILLIAMS BROS utilized the following PII when paying PEREZ for his
work and when reporting the payments to PEREZ to the IRS, though sometimes the payments
were not reported to the IRS at all:

DATE:  11/12/2002 – 10/20/2003
NAME USED:  Sergio Angel
SSN: 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
PAID:  $88,053

DATE:  10/24/2003 – 07/15/2005
NAME USED:  Fabien Perez
SSN: 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
PAID:  $99,082

DATE: 08/05/2011 – 07/13/2012
NAME USED: Alfredo Perez
SSN: 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
PAID: $100,000+

---

[3] The first five digits of the social security number have been masked by an "x" here and elsewhere in this Affidavit
when subsequent investigation revealed that the social security number was a "real" number belonging to someone
else.

DATE:  2011-2012
NAME:  Alfredo Perez
SSN:  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
ADDRESS:  4346 South Baily, Wichita, KS, 67219

## FALSE PII FOR AMARO

45.    OLDIGES and WILLIAMS BROS used the following PII when paying PEREZ for his work and when reporting the payments to PEREZ to the IRS, though sometimes the payments were not reported to the IRS at all:

DATE:  10/14/2005 – 01/13/2006
NAME USED:  Rogelio AMARO
SSN:  xxx-xx-2551
PAID:  $15,697

DATE:  06/07/2011 – 10/21/2011
NAME USED:  Joanne AMARO
SSN:  xxx-xx-5872
PAID:  $172,170

DATE:  10/21/2011 – 01/25/2012
NAME USED:  Jose Perez
SSN:  xxx-xx-3455
PAID:  $60,629

DATE:  03/23/2012 - PRESENT
NAME USED:  Carlos Gonzalez
SSN:  xxx-xx-2570
PAID:  $277,014

## FALSE PII FOR VALENCIA

46.    OLDIGES and WILLIAMS BROS utilized the following PII when paying VALENCIA for his work and when reporting the payments to VALENCIA to the IRS:

DATE: 11/18/2011 – 10/27/2012
NAME USED: Oscar VALENCIA-Mungia
SSN: 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 (Fictitious)
PAID: $354,171

**FALSE PII FOR OTHER WORKERS**

47.    OLDIGES and WILLIAMS BROS used fictitious PII to pay other workers and when notifying the IRS of the payments to those workers, including the following:

> DATE: 02/13/2009 – 09/09/2010
> NAME USED: Raul VARGUS
> SSN: 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
> PAID: $383,494

> DATE: 08/06/2004 – 08/14/2008
> NAME USED: Rodolfo SALAZAR
> SSN: xxx-xx-7536
> PAID: $107,089

> DATE: N/A
> NAME USED: George SALAZAR
> SSN: 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
> PAID: N/A

> DATE: 09/20/2010 – 05/18/2011
> NAME USED: Juan PABLO-Arias
> SSN: xxx-xx-3851
> PAID: $32,808

48.    OLDIGES has used an illegal alien, Obed CAMPUZANO, ("CAMPUZANO") since 2000 for cleaning and maintaining his residence. CAMPUZANO also occasionally worked for WILLIAMS BROS. WILLIAMS BROS paid CAMPAZUNO approximately $6000 in 2012, but CAMPAZUNO was not reported to the IRS as a WILLIAMS BROS' employee. The bookkeeper asked OLDIGES if CAMPAZUNO needed a "1099", referring to IRS From 1099-MISC, Miscellaneous Income. OLDIGES replied to the affect, "No, make him disappear off the books." The last payment made by WILLIAMS BROS to CAMPUZANO was in the amount of $970 on 09/16/2012 via a WILLIAMS BROS check.

**TREATMENT OF THE ILLEGAL ALIENS**

49.    When WILLIAMS BROS had an illegal alien who was injured, OLDIGES' policy was to make sure the injured worker did not reveal that they were working for or at the direction of OLDIGES or WILLIAMS BROS. OLDIGES generally fired the illegal alien worker from the company as soon as possible after their injury.

50.    On April, 12, 2012, one of WILLIAMS BROS' illegal alien workers, Jose Martinez VIBANCO ("VIBANCO"), fell off of a roof while working at WILLIAMS BROS project. PEREZ was VIBANCO'S supervisor. VIBANCO sustained a wrist and arm injury. PEREZ

contacted CORNISH. CORNISH drove to the accident site and transported VIBANCO to Miami Valley Hospital in Dayton, OH. CORNISH dropped off VIBANCO at the Emergency Room entrance. CORNISH instructed VIBANCO to tell the medical staff that he fell while riding his bicycle and that he was not employed with WILLIAMS BROS.

51.     Miami Valley Hospital records pertaining to VIBANCO reveal a Medicaid questionnaire. The employer information on the questionnaire was crossed out and had the markings of "N/A". The questionnaire indicated that VIBANCO was a resident of Ohio but not a citizen of the U.S. at the time of his hospital service. An income of $0 was provided for the three calendar months prior to the hospital service. A comment provided at the end of the questionnaire answered the question of how the patient is meeting daily needs. The answer indicated that VIBANCO's family supports him financially. The documentation further reveals that VIBANCO's hospital care was from April 12, 2012 through April 14, 2012, cost $47,481.10. A Hospital Account Notes Report indicates that on April 13, 2012, VIBANCO communicated through an interpreter that he is married with two children, currently separated with his wife, and lives alone. The notes reveal that VIBANCO indicated he is not a citizen of the U.S. but may qualify for Medicaid, for which an application was completed. Additional notes indicate that no financial payment has been made to the account, and it is waiting funding from Medicaid.

52.     Upon VIBANCO's release from medical supervision, OLDIGES paid him $1 per hour to pick up nails at various WILLIAMS BROS job sites. In September 2012, VIBANCO left the U.S. to return to Mexico.

## WILLIAMS BROS' PROFIT

53.     OLDIGES has been very successful in his roofing business in the Dayton, Ohio, area, because his profit margins allow him to provide lower bids than his competitors who employ legal labor. OLDIGES makes more profit than other competing roofing companies because he is able to pay less for his work force. WILLIAMS BROS' illegal alien workers are paid approximately half as much as WILLIAMS BROS' legal workers.

54.     WILLIAMS BROS averaged $300,000 in profits annually from 2000 until 2009. WILLIAMS BROS earned profits of approximately $1 million in 2010 and $1.5 million in 2011.

55.     WILLIAMS BROS made around $8.5 million in sales in 2012, and the profit was approximately $3 million.

56.     Approximately sixty-five percent of the work orders are completed by illegal alien labor, but the profit from the illegal alien labor is much greater than the profit derived from legal labor. When taking into account the illegal alien labor profit advantage, more than sixty-five percent of the approximately $3 million earned by WILLIAMS BROS in 2012 was earned through illegal alien labor.

**ASSETS**

57.     OLDIGES has withdrawn a significant portion of the profits WILLIAMS BROS has made by directing KRAMERCZYK to make wire transfers[4] out of the business checking account to OLDIGES' personal Account #6919 at PNC Bank. During 2012, at least three wire transfers were made in the amounts of $650,000, $350,000 and $300,000 into OLDIGES' personal Acct #6919 at PNC Bank. The OLDIGES recently purchased a home on Narrows Trace in Beavercreek with $484,000 in cash. The OLDIGES continue to live at their residence on Andrew Road in Dayton, Ohio. WILLIAMS BROS purchased and paid over $42,000.00 in cash for the 2012 GMC pickup truck that OLDIGES uses on a daily basis.

**Acct #9661 at JP Morgan Chase Bank in the name of William Brothers Inc. (Checking)**

58.     According the signature card for the account, the account was opened on September 12, 2003 at the Bank One branch located in Dayton, Ohio. At account inception the listed signers for the account were Gregory J. OLDIGES and Martin E. Williams. OLDIGES bought out partner Martin E. Williams and on December 19, 2005 Martin E. Williams was removed as a person with signatory authority over Acct #9661 and Acct #8949, the business savings account.

59.     Your affiant reviewed records from the WILLIAM BROS business checking Account #9661 at JPMC for 12/30/2006-9/28/2012. My analysis of the characteristics and activity within Acct #9661 at JPMC Bank is that this account is the main operating account used by WILLIAMS BROS. This account is used for processing payroll checks, collecting payments from customers, and paying suppliers. From your affiant's analysis of the business checking Acct #9661, coupled with my training and experience as a financial investigator, I observed that business checking Acct #9661 serves as the primary operating account for WILLIAMS BROS. Acct #9661 is the account were the proceeds of the construction services rendered using both legal and illegal labor are deposited. Acct #9661 also serves the account used to pay for materials and labor.

60.     The Acct #9661 at JPMC was used to make payments to the following individuals between January 01, 2010 and December 31, 2012:

        a.  RODRIGUEZ (AKA:  Selestino Loya-Valdovinof)

---

[4] The transfers which are referenced in this Affidavit as "wire transfers" are referred to as Automated Clearing House ("ACH") transfers in the financial community. ACH transfers happen via electronic messaging similar to wire transfers and are typically referred to as a 'wire' in the normal discourse of those outside of the financial and/or payments industry. The difference between an ACH transfer and a wire transfer is that a wire transfer goes directly from one bank account to another bank account, whereas the ACH transfer involves a central processor before the transfer reaches the recipient bank account. With an ACH transfer, the transaction information is typically sent from the originating financial institution (ODFI) to a centralized processor and 'cleared' overnight to the receiving financial institution (RDFI). For ease of readability the ACH transactions are referred to in this Affidavit as wire transfers.

Under the alias Valdovinos Selestino-Loya, RODRIGUEZ received 33 payments totaling $130,122.99 during calendar year 2011. The last record of a payment being made to RODRIGUEZ was on November 21, 2011.

b.  AMARO (AKA: Jose PEREZ & Carlos GONZALEZ)
Under the alias Jose PEREZ, AMARO received 15 payments totaling $67,189 during calendar year 2011. AMARO received five (5) payments totaling $15,050 during calendar year 2012. Under the alias Carlos GONZALEZ, AMARO received 52 payments totaling $332,634.03. The most recent payment made to AMARO was presented for payment against account ending -9661 on December 20, 2012. Joann AMARO received 24 payments totaling $158,686.72. During calendar year 2012, 10 payments were made in the name of Joan AMARO totaling $37,402. During the period in which records were analyzed, no payments were made directly to the name Rogelia AMARO.

c.  PEREZ (AKA: Fabien PEREZ & Alfredo PEREZ)
Under the alias Alfredo PEREZ, Fabien PEREZ-Angel received 18 payments totaling $80,757 during calendar year 2011. PEREZ-Angel received eight (8) payments totaling $34,450 during calendar year 2012.

d.  VALENCIA (AKA: Raul VARGUS & Juan Pablo ARIAS)
Using the alias Raul VARGUS, VALENCIA-Mungia received 31 payments totaling $114,892.50 during calendar year 2010. Using the alias Juan Pablo ARIAS, VALENCIA-Mungia received 10 payments totaling $26,252.09 during calendar year 2010. VALENCIA-Mungia received three (3) payments totaling $6,556.60 during calendar year 2011. Using his real name, VALENCIA-Mungia received five (5) payments totaling $43,374.87 during calendar year 2011. VALENCIA-Mungia received 46 payments totaling $310,772.11 during calendar year 2012.

61.    Between January 01, 2010 and December 31, 2012, there were 1,168 checks paid totaling $2,551,462.79 for labor costs. Your affiant observed that checks beginning with the digit '2' appeared to be for payment for labor provided. These checks consistently bore the handwritten addresses of job sites, and included space on the back endorsement area to note the address at which the job was performed. Totaling all checks beginning with '2' provided an approximate figure of all known legal and illegal labor servicing work performed by WILLIAMS BROS.

62.    Your Affiant's analysis of the records reveals that total illegal labor cost WILIAMS BROS approximately $1,358,139.90. This illegal labor costs represents approximately 53.2 % of total known labor costs attributable to contracting operations at WILLIAMS BROS. WILLIAMS BROS typically uses illegal labor for bigger jobs in order to achieve more profit by paying lower wages to the legal workers. Therefore, while illegal labor cost is approximately 53.2 % of WILLIAMS BROS' labor costs, your affiant believes that the percentage of revenue generated by the illegal workforce to be higher.

63.    There is probable cause to believe that at least half of the deposits into Acct #9661 are the proceeds of the violations set forth in paragraph 5.  Because approximately $9,054,216.56 million dollars was deposited into Acct #9661 after January 30, 2012, at least $4.5 million dollars represents the proceeds of the illegal alien use, identity fraud, false statements and conspiracy to commit those offenses.  As of December 31, 2012 there was $124,215.11 in the WILLIAMS BROS. checking Acct #9661.

### Acct #8949 at JP Morgan Chase Bank in the name of WILLIAMS BROS (Savings)

64.    You affiant conducted an analysis of the characteristics and activity within business savings Acct #8949 at JPMC Bank.  According the signature card for the account, the account was opened on September 12, 2003 at Bank One in Dayton, Ohio.  At account inception the listed signers for the account were Gregory J. OLDIGES and Martin E. Williams.  On December 19, 2005 Martin E. Williams was removed as a person with signatory authority over the account.

65.    Between January 01, 2010 and December 31, 2012 this account was funded with transfers in the amount of $5,837,361.61 from Acct #9661 at JPMC.  The amount of $5,388,540.80 was transferred out of Acct #8949 back to Acct #9661.  Some of the money transferred back was used to cover a potential balance gap between payables and receivables.  Some was transferred to Acct #9661 only to be transferred out again to another OLDIGES controlled account.

66.    Because the funds in Acct #8949 originate from Acct #9661, there is probable cause to believe that the balance in Acct #8949 represents the proceeds of the violations set forth in paragraph 5 and are involved in money laundering and are thus forfeitable to the United States.  As of December 31, 2012, there was $952,952.58 in the WILLIAMS BROS. Business Savings Acct #8949.

67.    Your affiant's analysis of the funds activity in Acct #8949 has determined that the seizure of the entire balance of the account will not jeopardize the business operation of WILLIAMS BROS and/or jeopardize the employment of their legal workforce.

### Acct #6919 at PNC Bank in the name of Greg OLDIGES (Checking)

68.    According the signature card for Acct #6919 at PNC Bank, the account was opened on September 22, 1997.  At account inception the listed signer for the account was Gregory J. OLDIGES.  Recent account statements list both Gregory OLDIGES and Linda OLDIGES as account holders.  Your affiant's review of Acct #6919 revealed that the account is primarily funded by incoming wire transfers originating from Acct #9661 at JPMC.  The funds in PNC Acct #6919 that came from a source other than JPMC Acct #6919 are an immaterial portion of the account balance.

69.    Between January, 2011 and September, 2012, OLDIGES checking Acct #6919 at PNC Bank has received $48,278.80 in wired payroll deposits originating from WILLIAMS BROS checking Acct #9661.  In addition to the payroll deposits, the amount of $1,005,973.89 was transferred from WILLIAMS BROS. Acct #9661 into OLDIGES' checking Acct #6919 at PNC

Bank. During the past year, starting February 1, 2012, the total amount deposited into the Acct #6919 from all sources was $1,467,511.63 detailed as follows:

| Statement Range | Deposit Amount |
|---|---|
| February, 2012 | 13334.22 |
| March, 2012 | 5350.83 |
| April, 2012 | 656200.21 |
| May, 2012 | 5368.86 |
| June, 2012 | 13281.4 |
| July, 2012 | 6183.47 |
| August, 2012 | 11712.82 |
| September, 2012 | 364011.37 |
| October, 2012 | 15163.89 |
| November, 2012 | 12876.37 |
| December, 2012 | 364028.02 |
| **Total** | **1467511.46** |

70.    There is probable cause that the balance in Acct #6919 are the proceeds of the violations set forth in paragraph 5 and are thus forfeitable to the United States. As of December 28, 2012, there was $35,728.82 in the OLDEGES' Personal Checking Acct #6919.

71.    Because Acct #6919 is the OLDIGES' personal checking account, the United States seeks the seizure of all contents of the account except $10,000 in order to leave money available for the payment of personal expenses.

**Acct #9549 at PNC Bank in the name of Greg OLDIGES (Savings)**

72.    According the signature card for Acct #9549, the savings account was opened on September 22, 1997. At account inception the listed signer for the account was Gregory J. OLDIGES. Recent account statements list both Gregory OLDIGES and Linda OLDIGES as account holders.

73.    Between July 07, 2011 and September 05, 2012, $781,650.30 was transferred from OLDIGES' personal checking Acct# 6919 to OLDIGES' saving Acct #9549. The origin of funds in OLDIGES' personal savings Acct #9549 is the WILLIAMS BROS business checking Acct #9661.

74. During the past year, the total amount of $975,232.93 has been deposited into the OLDEGES' Personal Savings Acct #9549 at PNC Bank as follows:

| Statement Range | Deposit Amount |
|---|---|
| February, 2012 | 13438.29 |
| March, 2012 | 90.15 |
| April, 2012 | 337089.56 |
| May, 2012 | 139.95 |
| June, 2012 | 123.01 |
| July, 2012 | 135.76 |
| August, 2012 | 12070.87 |
| September, 2012 | 361801.87 |
| October, 2012 | 117.32 |
| November, 2012 | 105.6 |
| December, 2012 | 250120.54 |
| **Total** | **975232.92** |

75. As of December 28, 2012, there was $865,962.50 in the OLDGES' personal savings Acct #9549.

**Acct #9672 at Huntington Bank in the amount of $100,000.00**

76. Your affiant traced OLDIGES payment of $100,000 to an entity named Hard Rock Partners 2012 Drilling Program Escrow. At this point in your affiant's investigation, it appears that the funds in the Hard Rock escrow account are pooled investment money, i.e., funds obtained by the company from investors.

77. My review of the BANK ACCOUNTS records indicated that the source of funds for the $100,000.00 deposited into the Huntington Bank Account #9672 were the proceeds of WILLIAMS BROS. roofing projects per the schedule below:

| Date | Credit | Debit | Source |
|---|---|---|---|
| 12/07/2012 | $250,000 to Acct #6919 | | Williams Brothers Acct #9661 |
| 12/10/2012 | | $250,000 | Transfer out of Acct #6919 |
| 12/10/2012 | $250,000 | | Transfer into Acct #9549 |
| 12/19/2012 | | $100,000 | Transfer out of Acct # 9459 |
| 12/19/2012 | $100,000 | | Transfer into |

| | | | Acct #6919 |
|---|---|---|---|
| 12/28/2012 | | $100,000 | $100,000 check to Huntington Bank #4606 clears |

78.     According to Huntington Bank records, check #4606 was deposited into Huntington Acct #9672. Huntington Acct #9672 was opened on February 29, 2012 and is titled Hard Rock Partners 2012-A LP. None of the authorized signers on the account are Gregory OLDIGES or any persons known to affiant to be affiliated with him. Research through corporate filings through the West Virginia Secretary of State yielded that Hard Rock Partners 2012-A, LP was created on December 28, 2011 as a domestic limited partnership organized under the parent organization Hard Rock Exploration at the same address listed on the Huntingtonton Bank signature card. Further corporate filing research indicated that Hard Rock Exploration is a West Virginia corporation formed on June 16, 2003 with a listed business purpose of Oil and Gas Extraction. Your affiant also located an internet site for Hard Rock Exploration which listed its company purpose as that of a natural gas exploration and drilling company. The website listing the company's corporate officers reveals that neither OLDIGES nor any persons known by your affiant to be associated with OLDIGES were listed on the website. Finally, your affiant was not able to find any evidence that Hard Rock Partners 2012-A, LP or its parent company, Hard Rock Exploration, was engaged in the business of providing materials and/or durable equipment to businesses engaged in the residential or commercial roofing industry. Therefore, your affiant believes that the money transferred to Huntington Bank from OLDIGES was not payment for any liabilities of OLDIGES or WILLIAMS BROS, but instead is an investment into the Hard Rock Company.

## 2012 GMC Pickup VIN #3GTP2WE77CG141102

79.     WILLIAMS BROS owns approximately twenty to twenty-five work trucks and four dump trucks which are kept at WIILIAMS BROS' place of business.

80.     OLDIGES operates the 2012 GMC Pickup Truck VIN:3GTP2WE77CG141102 daily and keeps it at his residence after he leaves WILLIAMS BROS in the evening. The truck is completely paid for. The GMC Sierra was purchased on 1/30/12. Records from the WILLIAMS BROS Account #9661 at JPMC reveal a check made payable to Bob Ross Buick, GMC Inc., in the amount of $42,488.46, dated 1/30/12. The Ohio BMV title history information shows that title was issued for the 2012 GMC Pickup truck on February 16, 2012 to Williams Brothers Roofing, Inc. at the known business address for WILLIAMS BROS., 3600 Valley Street, Dayton, OH 45424. The vehicle seller is listed as Bob Ross Buick, Inc. The sale price is listed as $42,481.27. On January 31, 2012, check number 68430 posted to WILLIAMS BROS. Acct #9661 in the amount of $42,488.46 payable to Bob Ross Buick-GMC.

**Acct #0105 at Fidelity Investments in the amount of $290,000 opened by Greg and/or Linda Oldiges**

81.   Your affiant found that OLDIGES used the proceeds of the WILLIAMS BROS roofing projects to acquire securities in the amount of approximately $290,000.00 at Fidelity Investments.

82.   Securities include many financial products, including but not limited to, life insurance contracts, annuities, bonds, stocks, mutual funds and hedge funds. It is unknown at this time the exact type of securities purchased with the $290,000.00

83.   OLDIGES transferred $290,000.00 via CHECK #4616 written on his personal checking Acct #6919 to Fidelity Investments. The check was signed by OLDIGES. I have reviewed an image of this check and observed that it was payable to a company called NFS, LLC. Open source research indicates that NFS, LLC is a processing agent for Fidelity Investments. I have confirmed with NFS, LLC that this check was deposited to Fidelity Investments for the benefit OLDIGES.

84.   My review of the bank records indicated that the source of funds for the $290,000 payment out of OLDIGES' personal Acct #6919 came from WILLIAMS BROS.' accounts as follows:

| Date | Credit | Debit | Source |
|------|--------|-------|--------|
| 01/02/2013 | $600,000 | | Acct #9549 |
| 01/03/2013 | $300,000 | | Acct #9661 |
| 01/07/2013 | | $290,000 | Acct #6919 Check #4616 |
| 01/08/2013 | | $300,000 | Acct #6919 Check #4617 |
| 01/08/2013 | | $310,000 | Acct #6919 Check #4618 |

**$300,000.00 transferred to Security Benefit Life Insurance by Greg Oldiges via Check #4617 drawn from PNC Bank Acct #6919, in the name of Greg and Linda Oldiges**

85.   Your affiant found that OLDIGES used the proceeds of the WILLIAMS BROS roofing projects to acquire securities in the amount of approximately $300,000.00 at Security Benefit Life Insurance.

86.   OLDIGES transferred $300,000.00 via CHECK #4617 written on his personal checking Acct #6919 to Security Benefit Life Insurance.

87.   I reviewed an image of the check and observed that it was made payable to "Security Benefit". The check was signed by OLDIGES. This check was processed by UMB Bank for

Security Benefit Life Insurance. I have confirmed with UMB Bank that the check item was deposited to a receivables account under the control of Security Benefit.

88. My review of the bank records indicated that the source of funds for the $300,000 payment out of OLDIGES' personal Acct #6919 came from WILLIAMS BROS.' accounts as follows:

| Date | Credit | Debit | Source |
|------|--------|-------|--------|
| 01/02/2013 | $600,000 | | Acct #9549 |
| 01/03/2013 | $300,000 | | Acct #9661 |
| 01/07/2013 | | $290,000 | Acct #6919 Check #4616 |
| 01/08/2013 | | $300,000 | Acct #6919 Check #4617 |
| 01/08/2013 | | $310,000 | Acct #6919 Check #4618 |

### $310,000.00 transferred to Security Benefit Life Insurance by Greg Oldiges via Check ##4618 drawn from PNC Bank Acct #6919, in the name of Greg and Linda Oldiges

89. Your affiant found that OLDIGES used the proceeds of the WILLIAMS BROS roofing projects to acquire securities in the amount of approximately $310,000.00 at Security Benefit Life Insurance.

90. OLDIGES transferred $310,000.00 via CHECK #4618 written on his personal checking Acct #6919 to Security Benefit Life Insurance.

91. I reviewed an image of the check and observed that it was made payable to "Security Benefit". The check was signed by OLDIGES. This check was processed by UMB Bank for Security Benefit Life Insurance. I have confirmed with UMB Bank that the check item was deposited to a receivables account under the control of Security Benefit.

92. My review of the bank records indicated that the source of funds for the $310,000 payment out of OLDIGES' personal Acct #6919 came from WILLIAMS BROS.' accounts as follows:

| Date | Credit | Debit | Source |
|------|--------|-------|--------|
| 01/02/2013 | $600,000 | | Acct #9549 |
| 01/03/2013 | $300,000 | | Acct #9661 |
| 01/07/2013 | | $290,000 | Acct #6919 Check #4616 |

| 01/08/2013 | | $300,000 | Acct #6919 Check #4617 |
| 01/08/2013 | | $310,000 | Acct #6919 Check #4618 |

## REAL ESTATE

93.    OLDIGES purchased a home on Narrows Trace, in Beavercreek, OH 45385, with $800,000 in cash. OLDIGES continues to lives on Andrew Rd., in Dayton, OH, however.

94.    Green County Recorder records indicate that Greg and Linda OLDIGES purchased the home on Narrows Trace, in Beavercreek, OH 45385, without a mortgage, on August 14, 2012, for $484,500.00. Records from Greg and Linda OLDIGES' personal Account, PNC Acct #6919, reflect a $475,612.66 withdrawal on August 6, 2012.

## Fungible Property Can Be Forfeited

95.    I am advised that, in pertinent part, Title 18, U.S.C. § 984(a) provides:

(1) In any forfeiture action in rem in which the subject property is cash [or] funds deposited in an account in a financial institution...

(A) it shall not be necessary for the Government to identify the specific property involved in the offense that is the basis for the forfeiture; and

(B) it shall not be a defense that the property involved in such an offense has been removed and replaced by identical property.

(2) Except as provided in subsection (b), any identical property found in the same place or account as the property involved in the offense that is the basis for the forfeiture shall be subject to forfeiture under this section.

96.    I am advised that, in essence, Section 984 allows the United States to seize for civil forfeiture identical property found in the same place where the "guilty" property had been kept. See United States v. All Funds Presently on Deposit at American Express Bank, 832 F. Supp. 542, 558 (E.D.N.Y. 1993). I am advised that, by Section 984 (a)(1)(b), therefore, this affidavit need not demonstrate that the monies now in the BANK ACCOUNTS are the particular monies that are the proceeds of 8 U.S.C. § 1324 (Bringing in and harboring certain aliens), 18 U.S.C. § 1028 (Fraud and related activity in connection with identification documents, authentication features, and information), 18 U.S.C. § 1028A (Aggravated identity theft), 18 U.S.C. § 1956 (Laundering of monetary instruments), 18 U.S.C. § 1957 (Engaging in monetary transactions in property derived from specified unlawful activity) or 18 U.S.C. § 1001

(Statements or entries generally) or the particular money involved in money laundering, so long as the forfeiture is sought for other funds on deposit in that same account.

97.     I am further advised that the "fungibility" rule of Section 984(b) cannot reach back in time for an unlimited period.  Section 984 (b) provides:

No action pursuant to this section to forfeit property not traceable directly to the offense that is the basis for the forfeiture may be commenced more than 1 year from the date of the offense.

98.     I am advised that, thus, Section 984 applies so long as the "action" to forfeit the property is commenced within one year from the date of the offense giving the basis for the forfeiture.

99.     Here, the dates of the offenses giving rise to the seizures are within the one year period.  Thus, I am advised that Section 984 makes the money in the BANK ACCOUNTS subject to seizure and forfeiture to the extent that monies that are the proceeds of the violations described above, or were involved in money laundering and were located in the BANK ACCOUNTS in the year preceding the seizure.

100.     In addition, within the past year, that is after January 30, 2012, the amount of $9,054,216.56 was deposited into WILLIAMS BROS' business checking Acct #9661.  Given that approximately $9,054,216.56 million dollars was deposited into Acct #9661 after January 30, 2012, at least $4.5 million dollars represents the proceeds of the illegal alien use, identity fraud, false statements and conspiracy to commit those offenses.

101.     Since January 30, 2012, approximately, $5,837,361.61 was transferred from the WILLIAMS BROS business checking Acct #9661 into WILLIAMS BROS savings Acct #8949.  These transfers include the proceeds of the illegal alien use, identity fraud, false statements and conspiracy to commit those offenses.  The transfers of the illegal proceeds into WILLIAMS BROS savings Acct #8949 to promote the offenses or conceal the nature or source of the funds constitute money laundering.  Thus, the funds currently in the savings Acct #8949 are subject to forfeiture as they are involved in money laundering.

102.  Since January 30, 2012, the amount of $5,388.540.80 was transferred back from Acct #8949 to checking Acct #9661 in order to promote the illegal activity.  The transfers of the illegal proceeds constitute money laundering.

## CONCLUSION

103.     Based on my investigation, WILLIAMS BROS and OLDIGES used illegal aliens to generate approximately $3 million dollars in profits in 2012 and deposited those proceeds into the WIILIAMS BROS business checking Acct #9661.  WILLIAMS BROS and OLDIGES engaged in money laundering when transferring the illegal proceeds from the WILLIAMS BROS

business checking account #9661 to the other BANK ACCOUNTS. Therefore, all of the funds in the BANK ACCOUNTS are subject to forfeiture.

104.    Based on the facts and circumstances presented in this Affidavit, there is probable cause to believe that the 2012 GMC Pickup truck, VIN:3GTP2WE77CG141102, is subject to forfeiture pursuant to:

> i.  18 U.S.C. § 981(a)(1)(C)(civil) and 28 U.S.C. § 2461(c)(criminal) as it represents the proceeds of violations of 8 U.S.C § 1324 (Bringing in and harboring certain aliens), 18 USC § 1028 (Fraud and related activity in connection with identification documents, authentication features, and information), 18 U.S.C. § 1028A (Aggravated identity theft), 18 U.S.C. §1029(Fraud in connection with access devices), 18 U.S.C. § 1956 (Laundering of monetary instruments), 18 U.S.C. § 1957 (Engaging in monetary transactions in property derived from specified unlawful activity), 18 U.S.C. § 1001 (Statements or entries generally), and/or 18 U.S.C. § 371 (Conspiracy);

> ii.  18 U.S.C. § 981(a)(1)(A)(civil) and 18 U.S.C. § 982(A)(1)(criminal) as it is involved in a violation of 18 U.S.C. § 1956 (Laundering of monetary instruments), 18 U.S.C. § 1957 (Engaging in monetary transactions in property derived from specified unlawful activity);

> iii.  8 U.S.C. § 1324(b)(civil) and 28 U.S.C. § 2461(c)(criminal) as it represents a vehicle that has been or is being used in the commission of a violation of 8 U.S.C. § 1324(a), or it represents the gross proceeds of such violation or is property traceable to such proceeds; and/or

> iv.  18 U.S.C.§ 1029(c)(1)(c)(criminal) as it represents property used or intended to be used to commit a violation of 18 U.S.C. §1029(Fraud in connection with access devices).

105.    Based on the facts and circumstances presented in this Affidavit, there is probable cause to believe that the contents of the BANK ACCOUNTS are subject to forfeiture pursuant to:

> i.  18 U.S.C. § 981(a)(1)(C)(civil) and 28 U.S.C. § 2461(c)(criminal) as it represents the proceeds of violations of 8 U.S.C § 1324 (Bringing in and harboring certain aliens), 18 USC § 1028 (Fraud and related activity in connection with identification documents, authentication features, and information), 18 U.S.C. § 1028A (Aggravated identity theft), 18 U.S.C. §1029(Fraud in connection with access devices), 18 U.S.C. § 1956 (Laundering of monetary instruments), 18 U.S.C. § 1957 (Engaging in monetary transactions in property derived from specified unlawful activity), 18 U.S.C. § 1001 (Statements or entries generally), and/or 18 U.S.C. § 371 (Conspiracy);

> ii.  18 U.S.C. § 981(a)(1)(A)(civil) and 18 U.S.C. § 982(A)(1)(criminal) as it is involved in a violation of 18 U.S.C. § 1956 (Laundering of monetary instruments),

18 U.S.C. § 1957 (Engaging in monetary transactions in property derived from specified unlawful activity);

iii.  8 U.S.C. § 1324(b)(civil) and 28 U.S.C. § 2461(c)(criminal) as it represents the gross proceeds of a violation of 8 U.S.C. § 1324(a), or is property traceable to such proceeds; and/or

iv.  18 U.S.C.§ 1029(c)(1)(c)(criminal) as it represents property used or intended to be used to commit a violation  of 18 U.S.C. §1029(Fraud in connection with access devices).

106.    Based on the facts and circumstances presented in this Affidavit, there is probable cause to believe that the SECURITIES are subject to forfeiture pursuant to:

i.  18 U.S.C. § 981(a)(1)(C)(civil) and 28 U.S.C. § 2461(c)(criminal) as it represents the proceeds of violations of 8 U.S.C § 1324 (Bringing in and harboring certain aliens), 18 USC § 1028 (Fraud and related activity in connection with identification documents, authentication features, and information), 18 U.S.C. § 1028A (Aggravated identity theft), 18 U.S.C. §1029(Fraud in connection with access devices), 18 U.S.C. § 1956 (Laundering of monetary instruments), 18 U.S.C. § 1957 (Engaging in monetary transactions in property derived from specified unlawful activity), 18 U.S.C. § 1001 (Statements or entries generally), and/or 18 U.S.C. § 371 (Conspiracy); and/or

ii.  18 U.S.C. § 981(a)(1)(A)(civil) and 18 U.S.C. § 982(A)(1)(criminal) as it is involved in a violation of 18 U.S.C. § 1956 (Laundering of monetary instruments), 18 U.S.C. § 1957 (Engaging in monetary transactions in property derived from specified unlawful activity).

Respectfully submitted,

DAVID GIBSON
Special Agent
HOMELAND SECURITY
INVESTIGATIONS

Subscribed and sworn to before me
on January ___ 2013, in Dayton, Ohio:

_____
Hon. Michael R. Merz
United States Magistrate Judge

Page **25** of 25